It's in Appeal No. 23-2553, the United States v. John Seiwert. Is it McAlis? Yes, Quinn McAlis on behalf of John Seiwert. Good morning. Good morning. Your Honor, the question before the court today is whether 18 U.S.C. 922-G3 violates the Second Amendment, or put another way, the question is whether stripping someone of their rights to possess a firearm solely because they are an unlawful user of controlled substances is a violation of Section 922-G3's historical tradition of firearm regulation. If 922-G3 is not consistent with that tradition, then the regulation is unconstitutional on its face and as applied to Mr. Seiwert. Under the historical tradition analysis required by Bruin and then reaffirmed by Rahimi, Section 922-G3, which prohibits firearm possession by users of controlled substances, whether they are currently intoxicated or not, and without any judicial determination of whether that user represents a credible threat of safety to others, and without any due process protections at all, is not constitutional. To start, Rahimi affirms that Mr. Seiwert's possession of a firearm is presumptively covered by the Second Amendment, that he is among the people whose conduct is protected under the Second Amendment. This was an issue that was, I think, before Rahimi, a little bit unclear. I want to start with Yancey and Cook from this circus, which the government argues have already settled the question, and those cases relied on analogizing disarmament of habitual drug users to historical laws that disarmed non-law-abiding and irresponsible citizens. Rahimi specifically rejects that argument at this point. For purposes of Yancey and Cook, just to try to narrow this down a little bit, do you agree that our circuit precedent at least resolves the vagueness challenge? I know you're talking about the Second Amendment, you're clear, but is the vagueness challenge foreclosed by our precedent? I read through the case that was submitted by the government, I think just two days ago. I don't agree. I think it's because there are other cases that have decided this issue after Rahimi that have still gone through the analysis that Rahimi did, which was- Okay, Rahimi, let's try to separate the vagueness challenge, right? That's not the Second Amendment argument you're making. The Second Amendment argument is grounded in Heller, Bruin, Rahimi, that whole line. But then I understood separately that Mr. Seward had argued, at least in the district court, that the statute is unconstitutionally vague as well. In other words, it violates the due process clause because it doesn't supply clear enough notice. And that's what I'm trying to do is to figure out whether, in your view, our precedent, Yancey and Cook in particular, foreclose that argument. And then we can focus on the Second Amendment. Sure. I would say that it does not foreclose it, but I understand the position. I don't know what my position is, but you want to focus this on the Second Amendment? I do. However, I do think that one of the focuses of the Second Amendment also, or at least under Rahimi, is that there is no notice, or at least that there's no judicial determination for a user. So that does kind of go back towards that vagueness issue, that there is no notice when it comes to a user of controlled substances. There is, however, a knowledge requirement, correct? There would be a knowledge requirement that that person is a user, not necessarily that they fall within a prohibited category, but that they are a user of controlled substances. They have to know they are using illegally on a regular and contemporaneous basis, or they have to know they're an addict, right? Yes. With respect to the responsible and law-abiding citizen argument, those terms don't exclude Mr. Seward from protections of the Second Amendment, and that's because a term like responsible is vague, as reiterated by Rahimi. And while previous case law frequently used responsible, law-abiding citizen to describe the class of people who enjoy the right under the Second Amendment, it was never adopted to define the limits of the Second Amendment. Ms. McInnes, the link between illegal drug use and habits that require payment of black market prices for feeding that habit and crimes to obtain money to pay for that seems to be pretty well accepted in our society. Well, I guess that's part of something that maybe the Seventh Circuit has agreed. There's a link between dangerousness and illegal drug use, whether that satisfies the requirements under Bruin and Rahimi. So you read Bruin and Rahimi, if I understand it correctly, say that somebody who is addicted to crack and needs to come up with several hundred dollars a day to feed an addiction has a Second Amendment right to possess and even carry in public, perhaps, an AR-15. Is that right? Well, that kind of connection was only really brought to the forefront in 1963. I'm sorry if it may be blank. Is that your position? My position is that under Bruin and Rahimi, that that is a question that we now have to determine whether there's a historical tradition for that. And you're saying no, so that the addict who has to come up with hundreds of dollars a day to feed the addiction has a right to possess and carry in public a semi-automatic pistol, maybe a semi-automatic assault rifle. I won't go as far as saying carry in public. I have not looked into that issue. But in terms of possessing a firearm? The right to bear arms. The right to bear arms. You're not going to say that this category of people gets to keep it only at home while everybody else has a Second Amendment right to carry, right? You're correct. So I go back to my question. Yes. I would say yes, that person has the right. That's where you go. Because the way that the language in statute is written, it's not just a crack addict who has to commit crimes in order to find— I'm talking about as applied. I will grant that there are problems under current jurisprudence around the edges of this. But let's talk about your client and people who have undisputed, serious addictions, regular use of heroin, cocaine, throw in fentanyl, methamphetamine, the kinds of cases that we see tearing at our social fabric. I would say that the way that the historical tradition, and as applied to a person who has an addiction, that that person, and the statute itself does not require that that person be actively intoxicated when they are possessing a firearm. Not when they need to come up with the money to get the fix. That's what we're talking about here. Right, and also when they're possessing a firearm, the government's not required to prove that they were intoxicated when they possessed a firearm. And so I think that is one of the issues here, is that there is no requirement under the statute or in trial that the government prove intoxication, and that the historical tradition only supports if that there are some instances where intoxication is the thing that prohibits the use of a firearm. I'm not concerned about somebody who is drunk being reckless with a firearm. Those kinds of intoxication requirements. I'm talking about the link between addiction and crime to feed the addiction. And you don't have to be high at that time. Right, and I guess in that situation, I think that the focus still remains on what is required under the statute, and as applied, the government in this case in particular, while there is a statement from Mr. Seward that he was an addict, that there was still not this connection of during the specific times of the possession. He said daily, right? He said daily, yes. That he was also a functioning addict. He didn't say that he was intoxicated daily. I mean, he basically admitted to the police department or whoever arrested him that he is a chronic addict. He's a daily user of crack and heroin. He never disputed that at all. So as Judge Hamilton is saying, he's in the market daily. He's chronically, at least to some level, impaired. Mentally, right, because of the altered mental state. I mean, he says he's functioning, but presumably he's taking the crack and heroin to alter his mental state. So on an as-applied basis, if you focus on the category in G3 of addict, I don't see why the analogy to the historic regulation that's laid out in great detail in some of these other circuits' recent opinions, why the fit is not sufficient when the analogy is to people that are dangerous, because of the linkage that Judge Hamilton is talking about. It's pretty clear in the Sixth Circuit's recent opinion. They talk about drug trafficking. I'll grant you he didn't admit he's a trafficker, but he did admit he's in the market for this. In fact, he's bartering a gun for drugs at one time. That way, and so when you look at the historic regulation of mentally ill, mentally impaired, there's no requirement that it's only the mentally ill with firearms. It's because of the unpredictability, the risk. So I don't know why the fit is not there historically, at least at a sufficient level of particularity post-Rahimi. Well, with respect to the analogy of a drug user to the mentally ill, that I don't think is a specific fit, because the regulations that were submitted by the government don't show that there was a specific disarmament component of those regulations. Why does the analysis have to proceed at that level of specificity post-Rahimi? I suppose because the government could submit at that point any sort of regulation where there was some period of incarceration. Doesn't incarceration sort of include disarmament? It does, but then we're not disarming people who are incarcerated for, for instance, if they commit some sort of petty offense and then they're charged with a misdemeanor and they're incarcerated. Well, they're incarcerated, they're disarmed, right? Right, and that would be a temporary disarmament. But what we're talking about here is a permanent disarmament. No. It would be a permanent disarmament because there is no end point or start point that is clearly defined for when— it is not clearly defined, but you have to know you're an addict or know you're using. You can stop using. I will put aside practical questions about the difficulty of beating addictions and stopping habitual use, okay? But some people manage to do that and get clean, and then they have restored to themselves their right to possess a firearm. But the way that the instruction is to the jury or the way that it is understood in terms of what's needed for conviction is that someone could not just wake up the next day and decide that they had not— Probably not the next day, no. But you've made the point about the knowledge requirement versus a, I think I'm clean, isn't that a good defense? I don't think that that would be a good defense with the instruction that's— So maybe there's an instruction problem. The instruction has to yield to the Second Amendment. So the point that Judge Hamilton is making is that suppose that Mr.— You pronounce it Seward? Yes. Okay. Suppose he turns over a new leaf, okay? And a few years from now, with whatever help he can get in prison and assumed further upon release or something, he kicks the habit, as difficult as that might be, or someone in his situation. I don't know at that point in time, T plus three, that we could say he's an unlawful user, present tense, in the past he was, and I don't think we could call him an addict. But we could call him a felon, which would then prohibit him from possessing a firearm.  But we're here on G3, right? We're here on G3. That's correct. So there's this kind of contemporaneous requirement that may be part— is part of the Second Amendment. That's what Judge Hamilton is probing, this kind of contemporaneous. And so in this particular case, at the moment of arrest, when the evidence pretty clearly shows that he has this whole cachet of firearms that maybe he inherited from his father that way, he's an admitted daily 20-year addict of crack and heroin. By his own acknowledgment. Well, I mean, Your Honor, I think that there's still— there are still questions about whether or not that actually— that there is an establishment of the facts that are— which show that that is some sort of impairment or that there is some sort of mental deficiency there that would be likened to the mentally ill requirements there. Okay, we got your position. Okay, very well. Thank you very much. We'll give you—I know you wanted some rebuttal time. We asked you a lot of questions. We'll give you some rebuttal time. Thank you. Okay, let's hear from the government. Good morning, and may it please the Court. Brian Kerwin for the United States. Your Honors, Section 922G3 does not offend the Second Amendment. Disarming drug addicts and other unlawful users of controlled substances is consistent with our nation's history and tradition of historical firearm regulation. Since the founding, as we point out through numerous examples in the brief, the government has disarmed categories of people who the government did not trust and whose firearm possession would necessarily present a risk of danger to the community, whether that's through mental illness, intoxication, or membership in various different groups who are not trusted to obey the law and therefore use a firearm safely. Mr. Kerwin, I don't want to interrupt your train of thought, so if the question does, you keep going and then just come back to the question.  It's this. It's interesting to me where you start. Okay? You're going right to—perhaps it's because of the dialogue, but you're going right to the historic regulation, and then you're making arguments for that. I get that. Okay. What about step one? What about Bruin's step one? Is— Let me ask it this way. Does Rahimi, in your view, foreclose a position that Mr. Seaworth is not protected by the Second Amendment because he's not law-abiding or responsible, or do you think that Rahimi has done away with your ability to argue that? You're talking about the plain text? Yeah, the plain text. Step one. Yeah, I don't— You see, if he's presumptively part of the people, I don't think we have to talk about common use here. Right. The government—well, I'll start with the premise of the question, judges, whether Rahimi answers that question. I don't know that Rahimi does. Obviously, there have been numerous references to the right belonging to law-abiding and responsible citizens in Bruin and Heller, et cetera. Right. The government's position with respect to G3, to unlawful controlled substance users, is that they are part of the people. It would be—despite that language, which I think at times appears to be referring to the text, at times appears to be referring to history and tradition, with respect to unlawful controlled substance users, it would be sort of an odd construct to say, you know, today you're not the people, tomorrow you're clean and sober, and, you know, you sort of oscillate back and forth. Okay. So the reason I'm pressing you on this, and we're going to give you— don't worry about the clock, we'll give you time, is if you say he's an admitted addict, he's a daily drug user, it necessarily follows that he's not law-abiding, and therefore he's not part of the people. The case should end there. Right? In other words, there's absolutely no reason to do a historical analysis. Well— Akin to the approach that we took in one panel opinion, United States versus gay. Right. You with me on that? I am. I'm with you. And I think Judge Rahimi and Bruin sort of compel historical analysis, and they do so here because if it's the government's position, you know, that unlawful controlled substance users are part of the people, then we have to turn to history and tradition. Yeah, that's what's tricky about this doctrinally. The government, as you know, had a heck of a time on the responsibility, on the responsible person part of this. If you listen to that oral argument, the Solicitor General had a very difficult time on that. That's not a criticism, it's just an observation. And then the very final paragraph of the court's majority opinion in Rahimi gets rid of the response. So the only thing that's possibly left is law abiding. But it's confusing to me because Mr. Rahimi was the furthest person from somebody that was law abiding. And the court then went and did the historical analysis. So the reason I'm asking you the question is I'm not sure what's left at step one. Well, at step one— Because you're acknowledging they did the historical analysis. In other words, we can't— There's no doubt Mr. Seward here is not law abiding. Can we just stop? And then it would be a pretty short opinion. I think the short answer to that question, Judge Scudder, is yes, but because of the danger that he poses with a firearm in his hands. And so we've got these analogs, these historical analogs, and we've got this language from the Supreme Court that says law abiding people don't have a firearm. Well, if he's not part of the people, we don't care about history. But with respect to unlawful controlled substance users, we're not taking the position that they're not. And so if they are, then we look to history and tradition. And being not law abiding might be shorthand for historical justifications for disarming folks. And so you can't stop there because the fact that he's not law abiding, by definition he's taking unlawful controlled substances, we know that. We did in United States v. Gay, we opted out of Bruin, Prawn 2. Well, Gay, of course, was a 922-G1 case. I know. I know. And so I think the historical tradition is different with respect to felons than it is with respect to controlled substances. Well, felons aren't law abiding. Of course. But they have a felony conviction on their record, and that's the reason why they're being disarmed. Unlawful controlled substance users are not being disarmed because of their prior criminal history. They're being disarmed because of the present risk that they pose in this state of addiction or ongoing and repeated use. And so that's why, despite the broad stroke language of law abiding citizens not being permitted to possess a firearm, I think that speaks to the tradition itself when you're talking about a class of people who are part of the people. And so we look to analogs that bear a resemblance in purpose and burden to the disarmament that's being challenged here. And so you've got classes and categories of folks who are disarmed over time because of the risks that they present to others with a firearm in their hands. Let me give you this hypothetical as applied. An elderly woman who possesses a firearm for personal protection that's kept in a safe in her home who is using marijuana medically and doing so in a state where it's lawful. So unlawful drug user under federal law, not under state law. As applied, how do you analyze that under G-3? Well, if it's prescribed by a physician, she may not fall within the text of G-3 to begin with. But if not prescribed, say she's purchasing it on her own and using it to self-medicate. Well, she's a controlled substance user, right? And Congress has found, and Yancey cites six different empirical studies that point to the empirical connection between controlled substance, chronic use of it, and violent crime. Okay, fair enough. But the historical analysis, does it not get a lot harder for you there? If you look at the three categories, mentally ill, dangerous persons, persons that are presenting a terror, and intoxicated persons. As opposed to, what's his name, John Seward. Okay, totally different fact pattern. Daily, chronic, narcotic impairment. I mean, I think intuitively you're right because, as Judge Hamilton suggested through his questioning, I don't think anyone reasonably doubts that a chronic heroin and crack cocaine user presents a danger with a firearm in his hands. Your grandmother situation provokes sort of like an indifferent, intuitive reaction. But we're still left with the Congressional findings that motivated the law in 1968 to dispossess all controlled substance users. Okay, so the legal question in that is this. Can we reach that conclusion as to a category, okay, the 75-year-old person and John Seward, or does current law, for better or for worse, compel a dangerousness inquiry? We can reach it as a category, and Rahimi says that explicitly. Rahimi says, although there was a judicial finding in the context of GA, there's nothing to be read in this opinion to suggest that legislatures cannot disarm people who present a special danger of misuse. And in making that statement, the court cites back to Heller, which says laws that disarm categories of felons or the mentally ill are presumptively lawful. And so we know that categorical bans are appropriate. Skowian and Yancey and Cantor have all acknowledged that as well. And so then the question becomes, is the categorical ban that we're talking about today one that has historical justifications by analogy? And that's why we're pointing to the mentally ill who were disarmed, to intoxicated folks who either couldn't have a gun or efforts were made to prevent them from abusing them, or other groups that just generally the government did not trust with a firearm in their hands because they were risky. Well, let's talk about that last category. It seems like historically it wasn't necessarily a fear that they were somehow mentally unstable, but they would foment insurrection. Isn't that kind of different from what the reasoning behind this particular statute was? Those analogs specifically judge they're different. I still think they're analogous, which is the operative question, because Catholics, folks who refuse to take loyalty oaths, outspoken critics of early government, they couldn't be trusted to abide by our law and to use a firearm safely. That's the same reason that 922G3 disarms controlled substance users. But in that same category is the going armed laws that we cite in the brief that were a focus of Brahimi, where those people actually have demonstrated the danger through their prior conduct of misusing a firearm. And because of that risk that they posed going forward, firearms taken from them. And so Brahimi makes explicitly clear that you don't focus on a singular analog or historical regulation and stop there. You can look at distinctly different legal regimes and take them together to suss out the principles that support constitutional regulation. And so, yes, were people suspected of potentially using a firearm to provoke treason? They were. Were people going armed laws suspected of engaging in future violent crime? They were. Were the mentally ill locked up because we didn't know what they were going to do with a firearm in their hands? They were. You know, the through line through the intoxication laws is akin to 922G3 as well. To Judge Hamilton's point, if you're intoxicated, you might misuse a firearm. If you're an addict, you're dangerous while you're high and in between highs. Going back to the Judge Scudder's question about step one, unlawful. Does that have does that have definable kind of confines? So in other words, you know, in in Mesa Rodriguez, right, we decided that unlawful non-citizens were unlawfully present in the United States, that they were entitled to Second Amendment protection. Right. And so they were unlawful. People. Right. And so would the government say that in that case, that Mesa Rodriguez was decided incorrectly, that, in fact, people, let's say, you know, non-citizens are here illegally. Do they do they have a Second Amendment right? They don't. And we would we would take the position that Mesa Rodriguez was decided wrongly. And there you've got a two pronged problem. I think you've got non-law abiding person who's also not a citizen. And that's sort of how the right has been described over and over. You know, felons are also different. So you have to be both. You have to be law abiding and you have to be a citizen for the Second Amendment. Well, it's just it's a double whammy. And Mesa Rodriguez in the G5 context, G1, it's non-law abiding. And our position is that felons are not the people either. Controlled substance users are different because they're not being disarmed because they're not because of their citizenship or because of their prior criminal history, because of the danger that their current state of addiction poses with a firearm in their hands going forward. So it's sort of a distinct category. And that's why we're taking the position. So do you think a law that prohibits all non-citizens from having firearms would be constitutional? I think that's the that's the question and was the question in Mesa Rodriguez. And it will be the question in an upcoming appeal whether that was correctly decided, given Bruin and Rahimi. And so the government's position is non-citizens don't have a Second Amendment right because they're not the people. If I'm here lawfully as with a lawful permanent resident, is that what you're saying? No Second Amendment rights? I don't think you want to say that. No, I don't think I want to say that, Judge. And it's in part because I'm not prepared to really explore the contours of G5 specifically. So I would be happy to brief that afterwards. But I don't know that I'm in the position to really flesh out that this morning. One more question just to try to get this down doctrinally where you all are at is just stipulate hypothetically. That you have a daily addicted narcotics user crack or heroin or whatever that everyone would agree does not present a danger to others at all. They have a firearm in a safe for safety at home, but they present their their homebound. They have a complete, complete safe history, all that. They just happen to be addicted that way. How does G3 apply there? G3 prohibits their firearm use because they're in a category that the government can constitutionally disarm. Coming back to the category. But if I can follow up on that. G3 is written in terms of any controlled substance, right? Yes. And to follow up on Judge Scudder's earlier question, if we get out of Schedule 1, we get to Schedules 3, 4, and 5. A weightlifter who's getting some steroid injections to bulk up a baseball player doing something like that. You'll probably be better than I am at coming up with fringe cases here that I would hope would never be prosecuted on these grounds. But it's hard to see how substances where there's no fairly direct link to crime from the addiction or use would get you there and answer a Second Amendment challenge. I think the most I can say to that, Judge Hamilton, is that Congress made findings with regards to all controlled substances, as you've said. So whether it's Control 3 or Schedule 3 or Schedule 1, you and I may have an intuitive reaction to the danger that person may or may not pose and how they get it and how they misuse firearms when they're high or in between highs or what have you. But Congress has made certain findings about the danger that they present. And we have to take those at face value or can we look behind them a little bit? Well, obviously we're not in that case today because there's nothing to look at. But in that hypothetical, let's say in a hyper-extreme case, you could truly show that the person that used steroids or whatever, the Schedule 3 substance, didn't fall within this category. I think then you're talking about interpreting the statute in a way that doesn't include them. No. I'm not talking about interpreting the statute. I'm talking about saying that the Second Amendment would prohibit the application of the broad statute in some cases. Perhaps in many cases. I think that person's as-applied challenge would have to look like a challenge to his ongoing and repeated use of a controlled substance because that's the category that Congress has found presents a danger. And so if that category is consistent with our history and tradition, then it's constitutional to disarm that category. Thank you. I see I'm out of time. I gather from Judge Scudder's questions that you're familiar with Cook and Yancey, so I won't address the vagueness of the question. She gets foreclosed by precedent. I do. So, thank you, and I ask the Court to affirm the judgment. Okay. Mr. Kerman, thanks to you. Ms. McHaz, we'll give you a few minutes on rebuttal here. Thank you. I do want to go back to maybe the as-applied and the factual parts of this case, and I know that the government said that Mr. Seward would be dangerous even in between highs. With respect to the evidence that was presented at the trial, there was this evidence that Mr. Seward had gone to a drug dealer's home and had exchanged a firearm with the hope of getting narcotics in the future. That did not happen because that person was then later arrested before he could make good on this promise. I think in that situation, then, we have a lack of specific evidence that Mr. Seward was presently high or intoxicated at the time that that particular firearm was given to this other person, and there was no evidence presented at trial that there was some sort of other dangerousness or that Mr. Seward was going out and committing other offenses in order to fund his habit there. With respect to the other offense, the other count in the case, that was, I believe, related to a search of the home that was conducted a month later, where, again, even though Mr. Seward admitted that he was a daily user, he was, again, waiting for someone to come and provide controlled substances to him, and that person had not arrived yet. That firearm was also found in between a couch and a wall. It was not something that he was holding when the officers came into the house. I do want to quickly address this question about a categorical ban or whether that was something that Rahimi supports, and I think that actually a lot of the language in Rahimi suggests that there is an emphasis on the fact that there would be a judicial process first before someone was judged to be dangerous or someone was found to be within a category that was prohibited under 922G. There was repeated reference to the burden of the right only after someone had been found to pose a threat or only after there had been some sort of finding by a judge. So those were the two points that I wanted to make in closing here. I'm almost out of time, Your Honors. Is there an additional point that you would like me to discuss at this point? No, hearing none, Ms. Michalis, thank you very much. I see here you accepted this case in the representation of Mr. Seward on appointment from the court, right?  We very much appreciate your advocacy, your contribution to him, and the issue we're trying to resolve. And, Mr. Kerwin, thanks to you and the government, we'll take the appeal under advisement. Thank you. Thank you.